# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERRY LEE GARTEN,

        Defendant-Appellant.

UNPUBLISHED
February 11, 2016

No. 323670
Livingston Circuit Court
LC No. 13-021302-FH

Before: O'CONNELL, P.J., and OWENS and BECKERING, JJ.

PER CURIAM.

Defendant, Terry Garten, appeals as of right his jury trial convictions of larceny over $1,000 but not more than $20,000, MCL 750.356(3)(a), and unlawfully driving away a motor vehicle (UDAA), MCL 750.413. He was sentenced on December 1, 2014, as a fourth habitual offender, MCL 769.10, to four to 20 years' imprisonment for each conviction. We affirm.

This case involves the theft of copper wire and a service truck from a Detroit Edison (DTE) service center in Howell on December 8, 2012. Garten allegedly worked with codefendants Michael Brown and Patrick Cronan to break into the service center and push large spools of copper wire onto a service truck. According to Cronan, Brown drove the service truck to Cronan's residence, while Cronan followed in his wife's car and Garten followed in his blazer. The men unloaded the wire into Cronan's barn, before Brown and Garten abandoned the service truck on US-23. Cronan testified that the next day, Garten and Brown helped him strip the wire, then Cronan took it to a recycling yard for money, which the three of them split.

Cronan pleaded guilty and received a lenient sentence in exchange for his testimony against Garten and Brown. Garten and Brown were tried together in front of two separate juries, and both were convicted of larceny and UDAA.[1] Defendant Garten raises issues in a brief filed by appellate counsel, as well as in propria persona in his supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004–6, Standard 4.

---

[1] Defendant Brown appeals his convictions as of right in Docket No. 325115.

## I.  APPELLATE BRIEF ISSUES

Defendant raises two issues in his brief submitted by appellate counsel, arguing that the trial court denied him due process and a fair trial by the admitting other acts evidence and exhibit 10.  We review a trial court's decision whether to admit or exclude evidence for an abuse of discretion.  *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010).  We review de novo preliminary questions of law, such as whether a rule of evidence precludes admission.  *Id.*

### A.  OTHER ACTS EVIDENCE

At trial, the prosecutor presented voluminous evidence that the three men made similar thefts before and after the theft at the Howell Service Center.  Defendant argues that this evidence confused the issues and was unfairly prejudicial to defendant because the amount of evidence presented regarding the other acts was the same as it was for the offenses for which defendant was on trial.[2]

MRE 404(b)(1), which addresses the admission of other acts evidence, provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Our Supreme Court in *Mardlin*, "unanimously confirmed that the opinions in *People v VanderVliet*, 444 Mich 52, 508 NW2d 114 (1993), amended 445 Mich 1205, 520 NW2d 338 (1994), *People v Crawford*, 458 Mich 376, 582 NW2d 785 (1998), and *People v Sabin (After Remand)*, 463 Mich 43, 614 NW2d 888 (2000), 'continue to form the foundation for a proper analysis of MRE 404(b).' "  *Mardlin*, 487 Mich at 615 n 6, quoting *People v Knox*, 469 Mich 502, 510, 674 NW2d 366 (2004).  The Court summarized the principles set forth in those cases:

> To admit evidence under MRE 404(b), the prosecutor must first establish that the evidence is logically relevant to a material fact in the case, as required by MRE 401 and MRE 402, and is *not* simply evidence of the defendant's character or relevant to his propensity to act in conformance with his character.  The prosecution thus bears an initial burden to show that the proffered evidence is

---

[2] We reject plaintiff's argument that this issue is unpreserved.  Although Garten's primary argument was that the prosecutor's notice to introduce the prior acts at trial was untimely, he also stated that he joined Brown's primary legal argument, which was that the probative value of the evidence, if any, was substantially outweighed by unfair prejudice.

relevant to a proper purpose under the nonexclusive list in MRE 404(b)(1) or is otherwise probative of a fact other than the defendant's character or criminal propensity. Evidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character. Evidence is *inadmissible* under this rule *only if* it is relevant *solely* to the defendant's character or criminal propensity. Stated another way, the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character. Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the MRE 403 balancing test, which permits the court to exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. Finally, upon request, the trial court may provide a limiting instruction to the jury under MRE 105 to specify that the jury may consider the evidence only for proper, noncharacter purposes. [*Mardlin*, 487 Mich at 615-616 (citations omitted).]

## 1. RELEVANCE

*Mardlin* explains that the first inquiry is whether the prosecutor showed that defendant's prior conviction is relevant to a proper noncharacter purpose under MRE 404(b)(1). Relevance involves two components: materiality and probative value. *Crawford*, 458 Mich at 388. "Materiality is the requirement that the proffered evidence be related to 'any fact that is of consequence' to the action." *Id.* Whereas, "[t]he probative force inquiry asks whether the proffered evidence tends 'to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 389-390, quoting MRE 401. Any tendency is sufficient, but under MRE 404(b), the evidence "truly must be probative of something *other* than the defendant's propensity to commit the crime." *Id.* at 390.

In this case, the prosecutor sought to admit evidence regarding the thefts at another DTE service center and a Consumers Energy service center to show defendant's common plan or scheme, intent, and identity in committing the theft at the Howell Service Center. The trial court held that the evidence was relevant to prove all three noncharacter purposes.

## a. SCHEME, PLAN, OR SYSTEM

First, we agree with the trial court that the other acts evidence was relevant to show defendant's scheme, plan, or system in doing an act. The evidence is material in this sense because it tends to prove that defendant committed the charged offenses of larceny and UDAA—a fact which he denied. "It is well established in Michigan that all elements of a criminal offense are 'in issue' when a defendant enters a plea of not guilty." *Crawford*, 458 Mich at 389. Defendant's common plan or scheme was material to a fact of consequence, specifically to show that defendant acted in concert with the codefendants to commit the charged offenses.

With regard to the probative force inquiry, when the theory of relevance is based on similarities between the other acts and the charged offense, the uncharged misconduct and the

charged offense must be "sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *Sabin*, 463 Mich at 63. In this case, the similarities between the uncharged misconduct and the charged offenses were striking, as to establish a sufficient factual nexus between the two. There was testimony that the three defendants acted in concert to steal copper wire from electrical companies to salvage it and make a profit. For each of the three incidents, defendants would meet at Cronan's residence and drive to the service center. Once there, one of the defendants would cut the fence and enter the property. One defendant would then find a service truck with keys and back it up to the rack containing spools of copper wire, while the other two would push the spools onto the service truck. One defendant would then cut the gate to allow another defendant to exit the property with the service truck. Two defendants would follow the service truck back to Cronan's residence, where they would unload the wire into Cronan's barn. Brown would then abandon the service truck along US-23 and Garten would give him a ride home. Cell phone mapping supports this evidence and further places all three defendants together and in the general area of the service centers and truck routes from the time the trucks were started to the time they were abandoned. The proffered evidence was highly probative to show that defendant employed a similar plan in doing an act in this case and to overcome the improper inference of character. See *Crawford*, 458 Mich at 391 (noting that "the question becomes whether the prosecutor carried its burden of demonstrating that the defendant's prior conviction establishes some intermediate inference, other than the improper inference of character, which in turn is probative of the ultimate issues in th[e] case"). Therefore, the trial court did not abuse its discretion by concluding that the other acts evidence was relevant to prove defendant's scheme, plan, or system in doing an act in this case.

### b. INTENT

We also agree with the trial court that the evidence was relevant to prove defendant's intent. Larceny is a specific intent crime that requires an intent to permanently deprive an owner of his property. *People v Pohl*, 202 Mich App 203, 205; 507 NW2d 819 (1993), remanded on other grounds by 445 Mich 918 (1994). One element of UDAA is that it must be "done willfully." *People v Dutra*, 155 Mich App 681, 685; 400 NW2d 619 (1986). While this does not require the prosecution to establish an intent to permanently deprive the owner of possession, it does require that the defendant have "guilty knowledge." *Id.* Defendant denied committing the charged offenses, which required the prosecution to prove specific intent, thereby making defendant's intent a fact of consequence to the action. But see *Sabin*, 463 Mich at 68-69 (noting that other acts evidence was not logically relevant under a theory that it proved the defendant's intent where the crime was a general intent crime, and thus, intent was not in issue). Therefore, the evidence was material to prove defendant's intent.

With regard to the probative force inquiry, the factual relationship of the evidence was not too remote to draw a permissible inference of defendant's intent in the present case. This is unlike in *Crawford*, where the past conduct was factually dissimilar. See *Crawford*, 458 Mich at 395-396 (finding that the factual relationship between the prior conviction and charged offense was too remote for the jury to draw a permissible intermediate inference of the defendant's mens rea). The strong similarities between the conduct, as discussed earlier, likely overshadows any impermissible character evidence and makes the evidence truly probative of defendant's intent. Therefore, the trial court did not abuse its discretion by concluding that the other acts evidence was relevant to prove defendant's intent.

## c. IDENTITY

Lastly, the evidence was also offered to prove defendant's identity. When similar conduct is being used to prove identity, there must be "a high degree of similarity" between the similar conduct and the charged offense. Specifically, there must be "special characteristics so uncommon, peculiar and distinctive as to lead compellingly to the conclusion that all were the handiwork of the defendant because all bore his distinctive style or 'touch.' " *People v Golochowicz*, 413 Mich 298, 325; 319 NW2d 518 (1982). While there was a high degree of similarity between the uncharged misconduct and the charged offense, we find it questionable whether the other acts evidence bore uncommon and peculiar characteristics distinctive to defendant. Close questions concerning the trial court's discretion to admit evidence, however, do not call for appellate reversal. *Id.* at 322. Further, any error in admitting the other acts evidence to prove identity is harmless, where the evidence was admissible for other noncharacter purposes, such as a common plan or scheme and intent.

## 2. MRE 403 BALANCING TEST

As explained in *Mardlin*, once it is determined that the evidence is relevant to a proper noncharacter purpose under MRE 404(b)(1), it must be shown that the evidence is not substantially outweighed by the danger of unfair prejudice under MRE 403. Defendant argues that given the volume of other acts evidence, he was forced to defend against all three incidents, rather than just the one he was on trial for. We acknowledge that the amount of evidence presented regarding the other acts committed by defendants was almost equal to the amount of evidence presented for the charged offenses. This certainly prejudices defendant to an extent and carries a high risk of confusion and misuse, as cautioned in *Crawford*, 458 Mich at 398.

However, MRE 403 does not prohibit prejudicial evidence. Rather, it prohibits evidence that is unfairly prejudicial. *Id.* "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Id.* In *Crawford*, the other acts evidence was factually dissimilar from the charged offense such that the only inference the jury could draw from the past conduct was an impermissible character inference that "if the defendant did it before, he probably did it again." *Id.* at 398-399. In other words, the evidence was marginally probative and the jury was very likely to give it undue weight. In this case, as discussed, the strong similarities between the uncharged misconduct and conduct of the charged offenses was *highly* probative to show that defendant employed a similar plan in doing an act in this case. Therefore, although the prosecution presented voluminous other acts evidence, given its probative value, the jury was less likely to give it undue weight.

Finally, the trial court provided a limiting instruction to the jury explaining the proper, noncharacter purpose for which it could consider the other acts evidence. A trial court's limiting instruction will generally enable the jury to sort out the evidence and consider it only for its proper purpose. *Mardlin*, 487 Mich. at 629. Indeed, jurors are presumed to follow the trial court's instructions. *People v Unger*, 278 Mich App 210, 235, 237; 749 NW2d 272 (2008). Therefore, we conclude that the trial court did not abuse its discretion in admitting the other acts evidence.

-5-

## B. ADMISSION OF EXHIBIT 10

Exhibit 10 was a spreadsheet showing the footage and value of the copper wire that was missing from the Howell Service Center. The document was generated from data in DTE's computer system and printed by Sheila Edie, a general supervisor over all the service centers in the surrounding Detroit area. Defendant challenged its admission after Edie, on cross-examination, could not explain some of the data. Specifically, the spreadsheet indicated that the Howell Service Center was missing 3,840 feet of wire, but the stock balance was zero, which is an indication that the service center was not supposed to have any of that type of wire in stock at the time of the theft. Edie could not explain why. She testified that the computer automatically ran the data, and she would have to go back and look at the data in the computer. The trial court determined that it was admissible under the business-record exception to the hearsay rule, and any issues with Edie testifying to the substance went to the weight and credibility of the exhibit and her testimony. We conclude any error in admitting the exhibit was harmless.

The business-record exception, MRE 803(6) provides,

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> **(6) Records of Regularly Conducted Activity.** A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

A key component of the business-records exception to the hearsay rule is the inherent trustworthiness of business records. *People v McDaniel*, 469 Mich 409, 414; 670 NW2d 659 (2003). The trustworthiness of the records is undermined when the records are prepared in anticipation of litigation. *Id.*

In this case, exhibit 10 was a data compilation, made by Edie, who at the time had personal knowledge of DTE's computer system and inventory. It was based on information transmitted to her by the senior warehouseman at the Howell Service Center, who also had personal knowledge of the missing inventory. Edie testified that the report was a preliminary report, kept in the course of regularly conducted business activity, to assign a value to the

missing wire based on the moving price of the wire at the time. It was prepared at the time the wire was reported missing and not in the anticipation of litigation. Further, Edie testified that it was a regular practice of DTE to keep records of the inventory and run reports when inventory is reported missing.

Edie was able to explain most of exhibit 10, with the exception discussed earlier. While Edie's inability to explain why the exhibit indicated that 3,840 feet of wire was missing, but the stock balance showed zero, certainly casts doubt on the trustworthiness of the document, any error in admitting the exhibit was harmless. MRE 103(a). The value of the wire could easily be determined by the amount of cash received by defendants at the recycling yard, which was evidenced by the receipts found at Cronan's residence and those kept by the recycling yard itself.

## II. STANDARD 4 BRIEF ISSUES

Defendant raises two issues in his Standard 4 brief, challenging the sufficiency of the evidence and the trial court's decision to qualify Whitefeather Cherokee as an expert witness. We review de novo claims of insufficient evidence, *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010), and we review a trial court's decision to qualify an expert and admit expert testimony for an abuse of discretion. *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999).

## A. SUFFICIENCY OF THE EVIDENCE

"Due process requires that a prosecutor introduce evidence sufficient to justify a trier of fact to conclude that the defendant is guilty beyond a reasonable doubt." *People v Tombs*, 260 Mich App 201, 206-207; 679 NW2d 77 (2003), aff'd by 472 Mich 446 (2005). Accordingly, we examine the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Ericksen*, 288 Mich App at 196. All evidentiary conflicts must be resolved in favor of the prosecution, and we "will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *Unger*, 278 Mich App at 222. "Circumstantial evidence and the reasonable inferences it permits are sufficient to support a conviction, provided the prosecution meets its constitutionally based burden of proof beyond a reasonable doubt." *Ericksen*, 288 Mich App at 196. Further, "because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

Defendant argues that there was insufficient evidence to convict him beyond a reasonable doubt of UDAA because Cronan repeatedly testified that Brown was the one who drove the DTE service truck. UDAA, MCL 750.413 provides,

> Any person who shall, wilfully and without authority, take possession of and drive or take away, and any person who shall assist in or be a party to such taking possession, driving or taking away of any motor vehicle, belonging to

another, shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 5 years.

The plain language of the statute states that any person "who shall assist in or be a party to . . . taking possession, driving or taking away" a motor vehicle is guilty of UDAA. Therefore, contrary to defendant's argument it does not matter that Brown was the person driving the DTE vehicle. Garten assisted in or was a party to taking possession and driving away the DTE service truck by driving his vehicle, along with Brown and Cronan, to the service center, following behind the stolen DTE truck to Cronan's house, and assisting Brown in abandoning the truck on the side of road. Accordingly, there was sufficient evidence to convict Garten beyond a reasonable doubt of UDAA.

Garten off-handedly argues that because Brown drove the vehicle, he also could not be guilty of larceny. "Larceny is the taking and carrying away of the property of another, done with felonious intent and without the owner's consent." *People v Gimotty*, 216 Mich App 254, 257-258; 549 NW2d 39 (1996). Garten was specifically charged with stealing property that had a value of $1,000 or more, but less than $20,000. MCL 750.356(3)(a). The prosecution presented receipts from the recycling yard dated December 10 and 11, 2012, days after the theft at the Howell Service Center that had Cronan's and Garten's name, phone number, and fingerprint. The receipts indicated that the men received over $3,000 in cash for copper wire. Cronan testified as to Garten's involvement in the Howell theft, and his testimony was supported by cell phone and GPS evidence presented at trial. Accordingly, there was sufficient evidence to convict Garten beyond a reasonable doubt of larceny.

## B. EXPERT WITNESS QUALIFICATION

Finally, defendant argues that the trial court erred by qualifying Cherokee as an expert witness under MRE 702 regarding the analysis of Metro PCS's records and equipment. MRE 702 governs the admissibility of expert testimony and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

When evaluating proposed expert testimony, MRE 702 requires a court to ensure that the testimony "(1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012).

With regard to the first inquiry, "[t]he party proffering the expert's testimony must persuade the court that the expert possesses specialized knowledge which will aid the trier of fact in understanding the evidence or determining a fact in issue." *People v Smith*, 425 Mich 98, 112;

387 NW2d 814 (1986), citing MRE 702. This must be something beyond common knowledge. *Kowalski*, 492 Mich at 123. In other words, the testimony must regard a matter that is not commonly understood by the average person. *Id.* In this case, Cherokee's testimony helped the jury understand the functions of Metro PCS's cell phone towers and techniques of locating or plotting origins of cell phone calls using Metro PCS's cell phone records. Cherokee explained how the cell phone data could show the general area where a call was placed. This information was not something an average juror would have previously known because it involved specialized training and knowledge.

With regard to the second inquiry, Cherokee was not required to have published works or to have given educational speeches to be qualified as an expert. The plain language of the rule states that a witness is qualified to testify as an expert based on "knowledge, skill, experience, training, or education." MRE 702. Cherokee testified that he has been employed with Metro PCS for five years as a custodian of records and an analyst. He has testified in approximately 300 trials, both federal and state, during his employment with Metro PCS. Cherokee testified that he was trained by the staff of the various departments at Metro PCS regarding legal issues, how the towers and phone records work, and how to retrieve and order the records. Further, every six months, or when new technology comes out, Cherokee testified that he attends more training. Cherokee testified that prior to his experience with Metro PCS, he worked for the United States Army in the intelligence unit, analyzing and tracking enemies by phones and satellites. He also worked for Homeland Security, investigating personnel breaches of agents by using cell phone tracking. Cherokee's testimony demonstrates that he was qualified to provide cell phone tracking testimony using Metro PCS's records based on his knowledge, experience, and training.

The final inquiry involves reliability. "MRE 702 requires the trial court to ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data—is reliable." *Gilbert v Daimler Chrysler Corp*, 470 Mich 749, 779; 685 NW2d 391 (2004). The inquiry is a flexible one and a trial court must ask "whether the opinion is rationally derived from a sound foundation." *Elher v Misra*, 308 Mich App 276, 289-290; 870 NW2d 335 (2014) (internal quotation marks and citation omitted). Defendant does not argue that Cherokee's testimony was unreliable. He simply argues he was not qualified to testify as an expert. Nevertheless, Cherokee's testimony was based on his specialized knowledge regarding Metro PCS's cell phone towers and cell phone records. He explained how the Metro PCS's towers work and how calls are routed to the various towers. Cherokee used this data to determine the defendants' general location. He explained exactly how the data was reflected in the cell phone records. This was reliable testimony. Therefore, the trial court did not abuse its discretion in qualifying Cherokee as an expert witness regarding the analysis of Metro PCS's records and equipment.

Affirmed.

                                                    /s/ Peter D. O'Connell
                                                    /s/ Donald S. Owens
                                                    /s/ Jane M. Beckering