*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLICATION
December 22, 2025
9:54 AM

Plaintiff-Appellee,

v

No. 367952
Berrien Circuit Court
LC No. 2022-015936-FH

SETH TORRESE LIPSCOMB,

Defendant-Appellant.

Before: LETICA, P.J., and M. J. KELLY and MARIANI, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of breaking and entering a building with intent to commit a larceny, MCL 750.110. He was sentenced as a habitual offender, fourth offense, MCL 769.12, to 60 months to 30 years' imprisonment. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

On October 12, 2022, a tenant of the Parkview North Apartments (Parkview) contacted Anthony Sergio, the complex's owner, about an issue. At trial, Sergio testified that the laundry rooms in the complex were broken into over a year ago, and, although this activity stopped for several months, it began again.

Sergio described the Parkview as having 12 units. There were doors in the front and back of the building with a numbered combination key lock. Although tenants had physical keys to enter their own apartments, they were given a unique key code for the front and back doors, which they were not to share with others.

When tenants entered the rear of the building, there was a north and a south laundry room, each containing one washer and dryer. The laundry rooms were accessible from the exterior doors and the interior of the building. The rooms were for the use of Parkview's tenants, not the public.

The washers and dryers were standard size machines with coin-operated slots. Each wash or dry cycle cost $2.00. To engage the machines, a tenant put quarters in the slots and slid the lever. The coins fell into a steel box located below the slide lever and the coin boxes could only

-1-

be opened with the special key. Sergio emptied the coin boxes every two weeks on Saturday mornings with the key. On a monthly basis, he collected between $950 and $1,000 from the coin boxes.

After the laundry machines' coin boxes were repeatedly broken into, Sergio attempted to stop the damage and theft by using white duct tape, hasps, and padlocks. Sergio also installed "dummy" cameras, but they likewise failed to deter the damage and theft. And, although Sergio had a difficult time locating an affordable functional camera, he ultimately purchased $350 battery-operated cameras that looked like smoke detectors. While the cameras would take pictures, they did not contain a date or time stamp.

When Sergio arrived at Parkview on October 12, he found the dryer was pulled away from the wall, the vent pipe broken, ripped duct tape, a hanging steel plate, and no coins in the box. At that time, Sergio did not have the dryer repaired; instead, he locked it shut and taped it again.

When Sergio last visited the laundry room on October 8, 2022, the dryer was still taped, sealed, and working. Sergio had last emptied the coin box on September 24, 2022.

Sergio later accessed the camera footage and downloaded it to a disk drive.[1] The video was recorded in short clips to preserve battery life. It showed that a man had entered through the back door wearing a sweatshirt.[2] He used a tool to rip the tape off the dryer and pry the plate open before turning the dryer upside down and rolling it back and forth to remove the quarters. The man was not a tenant and not allowed access to the laundry rooms or the coin boxes. Sergio took a picture of the dryer in the north laundry room that showed the damage to the machine.

Sergio testified that he purchased one smoke detector camera in 2021; however, he could not recall the exact date. Sergio checked his records, which reflected he purchased two more cameras on September 28, 2022. Sergio placed these cameras in the laundry room on September 29, 2022. Moreover, the data collected was stored on the camera. When the data was full, the computer chip was not manually erased; instead, the camera recorded over the old data. Sergio reported that the oldest data that he had on his camera was from August 22, 2022.

Sergio denied that the damage could have occurred two years earlier, stating that he had changed the paint color in the laundry room since that time. Sergio had no proof that defendant had broken into the laundry machines in 2020. Sergio knew that the 2022 incident occurred in the north laundry room because of the countertop and door location.

Sergio had the dryer repaired, had a receipt for the costs from a couple weeks ago, and it was now functional. He testified that he performed fixes on the damaged machinery because he

---

[1] Sergio checked the cameras when he discovered a problem such as a broken machine. He last checked the camera three to four weeks before October 12, 2022.

[2] Sergio testified that he previously obtained images of the perpetrator wearing a hoodie or a ball cap when he caused other damage to the laundry machines. Sergio learned that one smoke detector camera did not provide wide footage. Sergio had to buy a second camera and rotate the placement to get clear footage of the suspect.

could not afford to have them serviced every two weeks when the damage was occurring. He purchased the washers and dryers new at a cost of $1,700 each. And to repair the mechanisms on all four machines cost $3,700.

On October 24, 2022, Sergio reported the breaking and entering to Niles City Police Patrol Sergeant David Bosch. After watching the video, Bosch recognized defendant from prior videos and pictures that had been passed around the police department. Specifically, Niles Police Officer Jenny Evans had handled a case with defendant and she identified defendant by name to Bosch. Defendant's listed address was three to four blocks from Parkview. Bosch did not visit Parkview to obtain fingerprints or other evidence because many people had touched the laundry machines since the incident. Instead, Bosch e-mailed other officers or agencies to learn of similar crimes or complaints and any familiarity with the suspect. Niles City Detective Lieutenant Chad Mitchell was also able to identify defendant. Bosch acknowledged that Sergio's video did not have a date or time stamp and that it was the only evidence that he had of defendant's commission of the crime.

The remainder of the prosecutor's proofs at trial consisted of other-acts evidence. On October 1, 2019, Niles City Patrol Officer Jim Kidwell was working full-time on the day shift when he learned of a breaking and entering at Four Flags Plaza Apartments. A large screen television from the community room was taken. Kidwell obtained surveillance video of the larceny. Additionally, on November 18, 2019, a breaking and entering occurred at the Gateway Plaza Apartments, involving larceny from a washing machine at 2:00 a.m. There was also surveillance video of this incident. A man entered the fifth-floor laundry room and broke into a coin-operated machine through the top coin mechanism and removed the machine from the wall. Defendant committed the Four Flags and Gateway Apartment offenses. When questioned about the offenses, defendant said that he needed the money for "meth." A copy of defendant's certified conviction was admitted for attempted larceny.

Pokagon Tribal Police Detective Vincent Horton, who was previously a Niles City Police Department patrol officer, testified that he received a report of a breaking and entering at the 515 North Apartments on March 22, 2020. It involved prying open a coin box in a laundry room and was captured on surveillance video. Horton was able to consult with another officer who provided defendant's name. Horton then retrieved defendant's secretary of state photograph identification and a recent booking photograph to identify defendant in the video. Horton submitted the matter for charges including breaking and entering of a building and a coin box, and a certified record of conviction was admitted. In December 2020, defendant was given various sentences, including one for 19 months' imprisonment. Defendant opted not to speak to the police, and DNA evidence was not retrieved from the scene, only surveillance video.

In July 2020, a maintenance man for an apartment complex reported damage to laundry machines at 2:00 a.m. Again, surveillance video showed that the perpetrator pried the lid off coin-operated machines, tipped them over, and shook out the coins. Officer Evans processed latent fingerprints from the scene that were attributed to defendant.

Niles City Police Officer Carl Adams Ashley learned of a breaking and entering at the North Niles Villa Apartments on August 13, 2020. And, despite the perpetrator's attempt to move the cameras to face upward, there was surveillance video of the incident that occurred at 11:55 p.m. The perpetrator shook the washing machines and knelt to the floor. Because coins were found on

the floor, it was believed that the perpetrator removed them from the machines. Detective Lieutenant Mitchell identified defendant as the perpetrator for Ashley.[3] Although Ashley lifted fingerprints that did not correlate to defendant, charges were filed against him, but their disposition was unknown.

In 2020, Berrien County Sheriff's Officer Preston Huddleston was assigned to address complaints in Niles Township. On August 13, 2020, he learned of a breaking and entering at the Laser Wash. The owners found that the door to their business had been pried open and loose change had been stolen. The suspect was captured on surveillance video wearing a plastic grocery bag over his head. But blood splatter evidence was collected at the scene. Berrien County Sheriff's Detective Sergeant Ian Dodd assisted Huddleston with the processing of the evidence. According to the Michigan State Police laboratory report, the blood belonged to defendant. The prosecutor rested.

Defense counsel requested that alibi witnesses, including defendant's wife, daughter, and brother-in-law appear at 10:00 a.m., but they failed to show. Defendant nonetheless opted to testify against counsel's advice. Defendant also insisted on advising the jury of his prior sentence to prison and release on parole.

Defendant testified that, after he was released from prison in March 2022, he worked for West Construction, a company owned by his brother-in-law, Dwayne West. Defendant lived with his wife, daughter, and three grandchildren. Defendant's wife and daughter worked nights so defendant was responsible for babysitting the children.

On October 8, 2022, a Saturday, he worked for West. When he was done, he watched sports at home, which he also did on Sunday. On Monday, October 10, and Tuesday, October 11, defendant worked from 8:00 a.m. to 4:30 p.m. After work, he took his grandchildren to the park or the store; he then watched television.

But, on Wednesday, October 12, 2022, defendant had to go to Benton Harbor to meet with his parole officer. Thereafter, defendant went to Bible study with West, an ordained pastor.

Defendant was familiar with Parkview. In 2020, defendant had a friend who lived there. Defendant used to "go in the laundry room and take the money." Defendant testified that he was previously charged with taking the money out of Sergio's dryer. Defendant explained that he was on drugs at the time. But defendant denied going to Parkview between October 8 and 12, 2022.

Sometime after October 12, 2022, defendant went to Parkview at a friend's request. While defendant waited in his car, Sergio arrived and told him not to come to the property again.[4]

---

[3] Now Niles City Police Department Captain of Operations Mitchell corroborated the testimony of the other officers. Specifically, Mitchell viewed surveillance video of breaking and entering into apartment buildings and larceny of laundry machines and identified defendant as the perpetrator.

[4] Sergio insisted that he had never met defendant and denied telling him to leave his property.

On November 2, 2022, defendant visited his parole officer and was arrested for breaking and entering. Although defendant acknowledged Sergio's video, he noted that it contained no date and time. Defendant said that it was an "old video" from 2020. He added that he had pleaded guilty to three charges in exchange for dismissal of all other cases. Even so, defendant was arrested in spite of the fact that the Parkview offense was subject to his earlier plea deal.

On cross-examination, defendant could not explain Sergio's testimony that the cameras were purchased in 2021, but maintained that he was on the video from the crime committed in 2020. Defendant insisted the cameras must have been purchased by Sergio in 2020 and that Sergio lied about the date. Defendant testified that the new case from 2022 was relying on "an old picture from 2020." As for a passcode required to enter Parkview's exterior door, defendant testified that the passcode was not functioning or the door was left open or ajar.

The jury convicted defendant as charged.

## II. PRIOR BAD ACTS

Defendant first alleges that the trial court abused its discretion in admitting other bad acts evidence. We conclude that this issue does not entitle defendant to appellate relief.

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). A decision on a close evidentiary question generally cannot constitute an abuse of discretion. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Under MRE 103(a), "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party[.]"

The prosecutor filed a notice of intent to introduce charged misconduct evidence under MRE 404(b). According to the notice, defendant was charged with breaking and entering a building with intent to commit a larceny. Specifically, on October 12, 2022, defendant entered into an apartment building where he did not reside, proceeded to the laundry room, pried off the coin box on a dryer, and stole the coins. A review of police interviews and reports indicated that: (1) defendant took a television from a community room; (2) defendant entered an apartment complex and surveillance video showed his entry into laundry room and theft of coins from machine; (3) defendant entered an apartment building and used a tool to pry open a coin box, stealing $40 to $50; (4) defendant entered an apartment building by force and tipped over dryers for their coins before later returning with a tool to steal from the washer, resulting in breaking and entering charges; (5) defendant entered an apartment complex laundry room and surveillance video showed him breaking into the coin boxes when he was interrupted; and (6) defendant broke into a

car wash where loose change was stolen and a blood sample from the scene found that he was likely the contributor.[5]

The prosecutor attached the police incident report documenting these incidents. It was alleged the majority of the offenses involved the theft of coins from apartment complex laundry rooms and were offered for the relevant purpose of showing that this defendant had a common scheme, plan, or system of targeting business or residential structures to steal coins or money. The evidence was also offered to show absence of mistake or accident and to show identity. The prosecutor expressly stated that the evidence was not offered to show bad character or that defendant acted in conformity therewith. The prosecutor claimed that the evidence was logically relevant, the evidence addressed a fact of consequence, and its probative value was not outweighed by the prejudicial effect. Further, a limiting instruction would advise the jury of the proper purpose and consideration of the MRE 404(b) evidence.

Defendant filed an answer. Defendant noted that the trial court would need to decide whether the proposed evidence was admissible or inadmissible and highly prejudicial.

At the court hearing on the prosecutor's notice, the prosecutor noted that defendant had six prior offenses as reflected in the police reports, resulting in two convictions. Four charges were dismissed as a result of plea deals. Only one offense involved the theft of a television, but the remaining offenses involved theft from coin machines. The prosecutor argued consistent with her notice that the evidence was offered for a proper purpose, to show absence of mistake and identity, and was not more prejudicial than probative. Further, it was alleged that defendant was contesting his identity on the video in this laundry room. Because of his defense theory, the prior offenses were relevant to identity and absence of mistake. The prosecutor argued that defendant was identified as the perpetrator in the prior offenses because of surveillance video, fingerprints, and blood evidence. Therefore, the jury was not asked to make findings regarding the identity of the perpetrators of those offenses.

Defendant argued that the evidence was more prejudicial than probative. He also questioned whether it was the intent of the prosecutor to introduce the surveillance video in the cases that did not result in a conviction. The prosecutor expressed her intent to call the police officers to testify regarding the offenses and the investigations. In light of that answer, defendant

___

[5] Review of the prosecutor's notice of intent claims that the evidence was admissible to show a common scheme or plan. The prosecutor did not seek to admit the evidence under a modus operandi theory to prove identity. Under *People v Golochowicz*, 413 Mich 298, 307-309; 319 NW2d 518 (1982), a modus operandi test was established to prove identity. See *People v Mardlin*, 487 Mich 609, 621; 790 NW2d 607 (2010) ("*Golochowicz* thus established a test for admission under such a theory that required substantial evidence that the defendant committed the prior act and some 'special quality' of the act that tended to prove the defendant's identity."). Because the prosecution in this case did not allege a modus operandi theory, the *Golochowicz* test will not be analyzed.

claimed that it was not his intention to raise defense theories such as mistake or accident that would render the evidence pertinent.

The trial court reviewed the offenses presented by the prosecutor. It noted that the offenses appeared to indicate the same type of scheme and plan in breaking into businesses where coins could be stolen. Additionally, identity was an issue. The trial court found that the evidence was probative.[6] The trial court noted that the evidence had to be admitted for a proper purpose and a limiting instruction to the jury could ensure that it would be considered as such. Although the evidence was prejudicial, the trial court determined that defendant had not identified how it would be unfairly prejudicial. Therefore, the trial court did not find that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Ultimately, the trial court determined the evidence was relevant and admissible. The trial court entered a written order granting the prosecutor's notice to admit evidence under MRE 404(b).

In *People v Denson*, 500 Mich 385, 396-406; 902 NW2d 306 (2017), our Supreme Court held that the admission of evidence did not provide a ground for reversal unless the error was outcome determinative and identified the criteria for admission of other-acts evidence:

> When we find error in the admission of evidence, a preserved nonconstitutional error "is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative— i.e., that it undermined the reliability of the verdict." This inquiry "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." "In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error."

### III. MRE 404(b)

MRE 404 governs the admissibility of other-acts evidence. The general rule under MRE 404(b) is that evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts. Such evidence may, however, be admissible for other purposes under MRE 404(b)(1), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes,

---

[6] Specifically, the court held, "I do find in this particular case that these prior acts, all six of them, are material in that they would in proving identity as well in terms of the similar common scheme or plan be of consequence to a jury in making a decision as to whether it was the defendant, either on the video in this case or that would commit this type of crime using this particular common scheme or plan again in this particular geographic area. It is probative."

wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

The first sentence of this rule represents the deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes. Far from "a mere technicality," this prohibition "gives meaning to the central precept of our system of criminal justice, the presumption of innocence." This rule reflects the fear that a jury will convict a defendant on the basis of his or her allegedly bad character rather than because he or she is guilty beyond a reasonable doubt of the crimes charged. Indeed, the very danger of other-acts evidence "is not that it is irrelevant, but, to the contrary, that using bad acts evidence can weigh too much with the jury and . . . so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." Woven inextricably into the fabric of our jurisprudence is the principle that "we try cases, rather than persons . . . ." The second sentence of MRE 404(b)(1) establishes that other-acts evidence may be admissible for other nonpropensity purposes.

In [*People v* ]*VanderVliet*, [444 Mich 52, 55; 508 NW2d 114 (1993)] this Court articulated the following standard for the admission of other-acts evidence:

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury.

## A. PROPER PURPOSE

Under the first prong of the *VanderVliet* test, the question is whether the prosecution has articulated a proper noncharacter purpose for admission of the other-acts evidence. The prosecution bears the burden of establishing that purpose. MRE 404(b) prohibits the admission of other-acts evidence when the prosecution's only theory of relevance is that the other act demonstrates the defendant's inclination for wrongdoing in general and thus indicates that the defendant committed the conduct in question. On the other hand, such other-acts evidence may be admissible whenever it is also relevant to a noncharacter purpose, such as one of the purposes specifically enumerated in MRE 404(b)(1).

\* \* \*

However, we have warned that "a common pitfall in MRE 404(b) cases" is that trial courts tend to admit other-acts evidence merely because the proponent has articulated a permissible purpose. The "mechanical recitation" of a permissible purpose, "without explaining how the evidence relates to the recited purpose[], is insufficient to justify admission under MRE 404(b)." It is incumbent on a trial

court to "vigilantly weed out character evidence that is disguised as something else." In other words, merely *reciting* a proper purpose does not actually demonstrate the *existence* of a proper purpose for the particular other-acts evidence at issue and does not automatically render the evidence admissible. Rather, in order to determine whether an articulated purpose is, in fact, merely a front for the improper admission of other-acts evidence, the trial court must closely scrutinize the logical relevance of the evidence under the second prong of the *VanderVliet* test.

## B. LOGICAL RELEVANCE

Under the second prong of the *VanderVliet* test, logical relevance is determined by the application of MRE 401 and MRE 402. We have emphasized the importance of logical relevance, calling it the "touchstone" of the admissibility of other-acts evidence. Other-acts evidence is logically relevant if two components are present: materiality and probative value.

## 1. MATERIALITY

Materiality is the requirement that the other-acts evidence be related to " 'any fact that is of consequence' " to the action. "In other words, is the fact to be proven truly in issue?" The prosecution bears the burden of proving every element of a charged offense beyond a reasonable doubt. . . . However, because the specific other-acts evidence offered in this case was not probative of these defenses, the other-acts evidence itself was not material.

## 2. PROBATIVE VALUE

The prosecution must demonstrate the probative value of the other-acts evidence. In this case, the absence of probative value establishes the inadmissibility of the other-acts evidence under MRE 404(b).

Evidence is probative if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, "[t]he threshold is minimal: 'any' tendency is sufficient probative force." "In the context of prior acts evidence, however, MRE 404(b) stands as a sentinel at the gate: the proffered evidence truly must be probative of something *other* than the defendant's propensity to commit the crime." Thus, although the prosecution might claim a permissible purpose for the evidence under MRE 404(b), the prosecution must also *explain how* the evidence is relevant to that purpose without relying on a propensity inference. Ultimately, the court must determine whether the prosecution has established "some intermediate inference, other than the improper inference of character, which in turn is probative of the ultimate issues in [the] case . . . ." If not, the evidence is inadmissible.

In evaluating whether the prosecution has provided an intermediate inference other than an impermissible character inference, we examine the

similarity between a defendant's other act and the charged offense. In this case, we note that the prosecution sought to admit the other-acts evidence *particularly* based on the alleged similarities between the 2002 incident and the charged offense. The degree of similarity that is required between a defendant's other act and the charged offense depends on the manner in which the prosecution intends to use the other-acts evidence. The *VanderVliet* Court explained:

> If we ask, does [the] misconduct have to exhibit striking similarity with the misconduct being investigated, the answer is, only if similarity is relied on. Otherwise not. There are only two classes of case[s,] [those in which similarity is relied on and those in which it is not], and they do not depend on the nature of the evidence, but on the nature of the argument. [*VanderVliet*, 444 Mich at 67 (quotation marks and citation omitted; alterations in original).]

> This principle is clear. If the prosecution creates a theory of relevance based on the alleged similarity between a defendant's other act and the charged offense, we require a "striking similarity" between the two acts to find the other act admissible. When the prosecution's theory of relevancy is not based on the similarity between the other act and the charged offense, a "striking similarity" between the acts is not required.

> In cases in which the prosecution has relied on similarity in seeking to admit other-acts evidence, this Court and other courts have frequently prohibited the admission of that evidence under MRE 404(b) due to the dissimilarity between the other acts and the charged offenses.

> \* \* \*

> . . . Consequently, to prove sufficient similarity, the prosecution must show "striking similarity" between the other act and the charged offense. ("If we ask, does [the] misconduct have to exhibit striking similarity with the misconduct being investigated, the answer is, only if similarity is relied on.") ("The acts or events need not bear striking similarity to the offense charged if the theory of relevance does not itself center on similarity.") The prosecution has failed to show such similarity. [Citations and footnotes omitted.]

As noted, in *VanderVliet*, 444 Mich at 55, other-acts evidence may be admitted if it is offered for a proper purpose under MRE 404(b), the evidence is relevant under MRE 402 and MRE 104(b), the probative value of the evidence is not substantially outweighed by unfair prejudice, and, upon request, a limiting instruction may be read to the jury. See *Denson*, 500 Mich at 398.

Evidence is offered for a proper purpose if it is logically relevant as satisfied by two components, materiality and probative value. *Id.* at 401. Materiality means that other-acts evidence must be related to any fact that is of consequence. And evidence is probative if it makes the existence of a consequential fact more probable than it would be without the evidence. At the

time the prosecutor filed its notice of intent, it attached police reports[7] predominantly addressing breaking and entering of apartment buildings where laundry machines were broken into to steal coins.

The police reports reflected a pattern of theft from buildings. On October 1, 2019, defendant was suspected of entering the community room of the Four Flags Plaza at 1:44 a.m. and stealing a 65-inch television. The perpetrator was captured on video, but facial recognition software did not reveal the suspect. But, when a laundry room coin machine was broken into four months later, defendant was captured on that surveillance video and this led to his identification as the Four Flags Plaza suspect. On November 18, 2019, the Gateway Plaza apartments had their laundry machines broken into and a theft of coins occurred. A tenant was captured on surveillance video allowing defendant into the building and he proceeded to the laundry area. On March 22, 2020, an employee of the 515 North Apartments reported a theft from the laundry coin machine. After the surveillance video was pulled, defendant was identified as the perpetrator upon comparison to other similar breaking and entering cases.

And, on July 29, 2020, police were called to Skyline Apartments by the maintenance man who reported break-ins of the laundry room's coin machines. The surveillance video captured the perpetrator prying off the lid on the coin-operated washers and dryers, tipping the machines over, and picking up the coins from the ground. On August 18, 2020, the security footage was reviewed by then-Detective Lieutenant Mitchell who identified defendant, noting that defendant had been arrested in April 2020 for the same crime of stealing from apartment-building coin-operated laundry facilities. Similarly, on August 13, 2020, a caller from North Niles Villa, an apartment building, reported that a light-skinned black male entered the laundry room and broke into the washing machine's coin compartment. The incident was captured on surveillance video. The suspect entered the laundry room and attempted to shift the camera so that it would not record him, but he was still visible. The suspect turned the machine over, tampered with the coin box, but was interrupted and left out a window. Detective Mitchell was shown the surveillance video and identified defendant as the perpetrator. Also on August 13, 2020, the police were dispatched to Laser Wash, a car wash, because of unauthorized entry into their utility room. A jar of loose change was taken. There was blood found on the concrete and in the utility room. The surveillance video recorded the suspect approaching the building and then leaving through the west door. The blood sample matched defendant's DNA profile.

We conclude that the prosecutor properly proffered this evidence to show defendant's common scheme or plan as well as lack of mistake or accident and identity.[8] The other-acts

---

[7] In his brief on appeal, defendant cites to the trial testimony of the police witnesses to demonstrate that the trial court abused its discretion, noting the amount of witnesses called. However, the trial court ruled on the admissibility of this evidence before trial commenced.

[8] Even so, because there was no claim by defendant that he acted mistakenly or by accident, the evidence was not relevant under either an absence of mistake or accident theory. See *People v Pesquera*, 244 Mich App 305, 319-320; 625 NW2d 407 (2001). Therefore, the trial court abused its discretion in admitting the evidence on this ground; however, any error was harmless because the evidence was admissible on the other grounds offered by the prosecution.

evidence that pertained to the breaking and entering into laundry rooms in apartment buildings was pertinent to show defendant's pattern of committing these acts to steal the proceeds of coin-operated machines. Defendant's history of engaging in such strikingly similar conduct caused police officers to view the surveillance videos of other related crimes in order to identify defendant as the common perpetrator. And defendant's repetitive actions generally directed at apartment buildings and laundry machines made it more probable that he was the perpetrator who unlawfully entered Parkview, caused damage to the dryer, and took the money from the coin box. Indeed, Sergio's smoke detector camera was able to capture a video of the perpetrator, who bore a striking resemblance to defendant. The probative value of the evidence was not outweighed by the danger of unfair prejudice. The evidence was not offered to show that defendant acted in conformity with his prior other acts. Instead, it was offered to show that defendant engaged in a common scheme or plan to commit a larceny from laundry machines in apartment buildings, that these other acts were strikingly similar, and that defendant's identification was acquired premised on the number of acts that he committed on surveillance video.

Finally, the trial court gave the jury a limiting instruction addressing the purpose of the other-acts evidence:

> You have heard evidence that was introduced to show that the defendant committed crimes for which he is not on trial. If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show[:] (A) that the defendant acted purposefully, that is not by accident or mistake or because he misjudged the situation. (B) That the defendant used a plan[,] system or characteristic scheme that he has used before or since. (C) Who committed the crime that the defendant is charged with. You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct. All the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime, or you must find him not guilty.

Thus, we conclude that the trial court did not abuse its discretion by admitting evidence of the other strikingly similar offenses pertaining to the damage to laundry and coin machines to steal money. However, the strikingly similar requirement was lacking with regard to the entry into a community room to steal a large screen television and entry into the utility room of a car wash. Although we conclude that the trial court abused its discretion by allowing the non-strikingly similar other-acts evidence to be admitted, the erroneous admission of this other-acts evidence is presumptively not a basis to reverse unless it appears, more probable than not, that the admission was outcome determinative. *Denson*, 500 Mich at 396. We cannot conclude that the erroneous admission constituted outcome-determinative error. Sergio had videotape depicting defendant in the laundry room removing coins from the dryer. Defendant admitted he was on the video; however, defendant maintained that the video, which lacked a date and time stamp, was from a 2020 incident when he broke into the Parkview's laundry machines to support his drug habit. Defendant further asserted that he entered into a plea deal that essentially exempted him from prosecution for the 2020 breaking and entering of Parkview. Yet, there was no record evidence that Sergio filed a police report in 2020 alleging a break-in and theft of coins from his property,

-12-

no evidence that Sergio had functioning surveillance video cameras at that time, and no evidence of a plea deal that prevented the prosecution from pursuing charges arising from the criminal conduct that occurred at Parkview. Accordingly, defendant was not entitled to appellate relief.

## III. SUFFICIENCY OF THE EVIDENCE

Next, defendant argues that there was insufficient evidence to support his conviction of breaking and entering a building with intent to commit a larceny. We disagree.

"A defendant need not take any action to preserve a challenge to the sufficiency of the evidence." *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011). In *People v Baskerville*, 333 Mich App 276, 282-283; 963 NW2d 620 (2020), this Court addressed challenges to the sufficiency of the evidence:

> We review de novo a challenge to the sufficiency of the evidence. When ascertaining whether sufficient evidence was presented at trial to support a conviction, we must "review[] the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict. All conflicting evidence, and any reasonable inferences that may be drawn from that evidence, must be resolved in favor of the prosecution. [Citations omitted.]

> MCL 750.110 addresses breaking and entering:

> (1) A person who breaks and enters, with intent to commit a felony or a larceny therein, a tent, hotel, office, store, shop, warehouse, barn, granary, factory or other building, structure, boat, ship, shipping container, or railroad car is guilty of a felony punishable by imprisonment for not more than 10 years.

"The elements of the offense of breaking and entering with intent to commit larceny are (1) the defendant broke into a building, (2) the defendant entered the building, and (3) at the time of the breaking and entering, the defendant intended to commit a larceny therein." *People v Toole*, 227 Mich App 656, 658; 576 NW2d 441 (1998). Any amount of force employed to open a door or window to enter the building, even if slight, is sufficient to meet the breaking requirement. *Id*. at 659. But, a breaking does not occur if the defendant rightfully entered the building. *Id*. "Larceny requires an intent to take and carry away someone else's property without that person's consent." *People v Pohl*, 202 Mich App 203, 205; 507 NW2d 819 (1993). "For purposes of larceny, the 'owner' is the person who has rightful possession and control of the property." *Id*.

In his brief on appeal, defendant does not reference the elements of the convicted offense. Instead, he protests his identification as the perpetrator of the crime. Specifically, he claims that his drug use caused him to commit a series of breaking and entering crimes in 2020. And defendant contends that the video submitted by Sergio was insufficient to convict him because it did not contain a date and time stamp. Again, we disagree.

-13-

Identity is an essential element in a criminal prosecution. *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976); *People v Fairey*, 325 Mich App 645, 649; 928 NW2d 705 (2018). "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). "The credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *Id*.

In the present case, Sergio testified that someone repeatedly entered his apartment building, proceeded to the laundry rooms, pried off the top of the coin lock box, tipped over the laundry machines, and stole the quarters from the machine. Sergio contended that these break-ins occurred for a period of time, stopped, and then resumed. After the break-ins resumed, he purchased a smoke detector camera. This installation occurred in 2021. Sergio testified that he purchased two additional smoke detector cameras on September 28, 2022, and installed them on September 29, 2022. He further advised that the smoke detector cameras contained a computer chip. Once, the chip was full of data, it simply rerecorded over the old data. Sergio testified that the oldest data available was from August 22, 2022. Despite the lack of a date and time stamp on the video, Sergio testified that he installed the smoke detector cameras in 2021 and 2022. He further testified that the video that recorded defendant's entry into the laundry room and destruction of the dryer coin mechanism was not from 2020. He insisted that the laundry room was a different paint color in 2022. Additionally, Sergio testified that he checked the camera data when an incident occurred. On October 12, 2022, he checked the cameras after he was notified of a problem by a tenant. Upon arriving at the apartment building, Sergio discovered the damage to the dryer. Before being notified of this problem, Sergio last checked the cameras in September 2022. Thus, by Sergio's account, the video and photographic evidence reflected defendant's entry onto the premises and damage to the dryer that occurred on or about October 12, 2022.

To the contrary, defendant testified that his breaking and entering of Sergio's premises occurred in 2020, and he entered into a universal plea deal that prevented him from being charged with the crime at Parkview.[9] And, defendant opined that it was nonsensical that Sergio would purchase and place a camera in 2021 when defendant was incarcerated.

This dispute presented a credibility issue that was resolved against defendant and in favor of the prosecution. Specifically, the jury chose to believe Sergio's testimony that he placed smoke detector cameras in 2021 and added additional cameras in 2022. Sergio monitored the data on the smoke detector cameras and found data indicating a break-in and destruction of a dryer on or about October 12, 2022. He further opined that the data would not be retained on the camera from 2020 because the data was written over once the capacity was reached.

When examining the sufficiency of the evidence, the evidence is viewed in favor of the prosecution with reasonable inferences and credibility choices in favor of the jury verdict. *Baskerville*, 333 Mich App at 282-283. Defendant's contention that there was insufficient evidence to support his conviction is without merit. Sergio presented evidence that the dryer

---

[9] Curiously, defendant did not present evidence of a police report reflecting Sergio's complaint and video evidence in 2020. Again, he did not offer proof that he entered into a global plea agreement that precluded the subsequent prosecution of earlier offenses, including the incident at Parkview.

incident involving defendant occurred in October 2022. Defendant blanketly asserted that it occurred in 2020, contending that Sergio simply lied about the date of installation of the smoke detector camera. The jury, by its verdict, rejected defendant's claim and he is not entitled to appellate relief.

## IV. RESTITUTION

Defendant contends the trial court abused its discretion in its award of restitution. We disagree.

The trial court's restitution order is reviewed for an abuse of discretion. *People v Fawaz*, 299 Mich App 55, 64; 829 NW2d 259 (2012). The trial court's factual findings pertaining to restitution are reviewed for clear error. *Id.*

During the last sentencing hearing, the trial court also held a hearing addressing restitution. Sergio testified that he gave an estimate of what restitution would be at the preliminary examination. At that time, Sergio had not contacted Spintech, a professional equipment service provider. Spintech gave Sergio three invoices/estimates to make his laundry machines "look[] new and workable." This contact and work occurred after the preliminary examination. Sergio was given an estimate of $3,710.90 to repair the smashed covers and parts of all machines. A second invoice of $200 was to service the dryer and make it operational. The third invoice was $546.36 to replace the element board in the dryer. Sergio requested total restitution of $4,457.26 reflecting these estimates/invoices. Upon questioning by the trial court, Sergio opined that invoices two and three pertained to the October 2022 incident involving the dryer in the north laundry room. Sergio acknowledged that the south laundry room was also broken into but he did not have cameras placed there. Invoice one addressed all four machines at the properties, and all four machines were damaged at some point because they were pried open. Sergio testified that he did not have problems with the laundry machines until the break-ins occurred.

On cross-examination, Sergio advised that invoices two and three were paid. He also acknowledged that he estimated the cost of repair of $1,200 solely in reference to the damaged dryer. However, the estimate of $3,710.90 would pay to repair the smashed covers and parts of all machines.

Defendant called Tiaan Voight to testify; he serviced industrial laundry equipment including coin-operated washers and dryers. Voight opined that $419.23 was necessary to repair the damage to the coin vaults, new coin slides, the switches, and inside electronics of all four machines. Invoice two reflected the cost to ascertain the problem with the dryer and invoice three reflected the cost of fixing the dryer. Sergio paid invoices two and three. The remaining estimate was to repair the damage done to all four machines.

When recalled, Sergio testified that defendant damaged the north laundry room dryer in October 2022. And he further opined that defendant had broken into all four appliances. However, at that time, Sergio did not have cameras in the south laundry room to demonstrate defendant's damage there.

The trial court ruled:

With regard to the restitution issue. I did review the trial testimony as well as the preliminary testimony. [Defense counsel], you seem to be focused on the preliminary examination. I don't need to remind you that we have an entire trial in this matter, which obviously flushes out issues much more fully than a preliminary examination would. The preliminary examination is focused on a very particular thing.

The trial testimony is clear that Mr. Sergio testified about this particular dryer, that we've all agreed on here, in the North Laundry room. Each of the laundry, each of the two laundry rooms at this building has one dryer and washer. Mr. Ser[g]io also testified that he usually empties those washers and dryers every two weeks, on average getting about $500.00 out of all four. Estimated monthly income from those items, $950.00 to $1000.00. I would note, [defendant], that Mr. Sergio isn't even asking for the amount of money that was taken that you stole from him. He's simply asking for the repairs to the laundry machines.

I do note that he indicated at the trial that on that October 12th date only that North laundry room dryer had been broken into. However, his testimony also indicated at trial that the machines had been being broken into for about six to eight months. I also recall testimony at the trial that [defendant] was released from prison earlier that year in 2022 in which is when both break ins began. Mr. Sergio was consistent in his trial testimony that he did not have any cameras operating in the other laundry, I don't know if it's the South laundry room or whatever, but the one not the North laundry room but the other laundry room. That he put a camera in this particular laundry room as a result of the break-ins and the damage to the machines.

I also note that at the trial he indicated he thought about $3700 to repair the four housings of those machines. He had basically just tried to keep them running during all of this because he didn't wanna repair them just to have them being broke into again. He also testified that . . . the methods of the break ins were essentially the same during that six-to-eight-month period. He also testified about that North laundry room dryer that he had paid approximately $1700.00 for it four years earlier.

He also indicated in his victim impact statement that, I believe it was, since the report was made on October 12th, there were more break ins. Two of the machines being badly damaged as a result of that. I do note that [defendant] was not arrested immediately when this was reported in October of 2022.

Therefore, I note that for purposes of restitution the issue is not beyond a reasonable doubt. It is a sentencing issue. It's a preponderant standard. I also note that course of conduct for the statute is appropriate for the Court to consider. I have considered all of that. I do have the estimate of People's 1 for the repairing the damage to all four of those machines in each of the two laundry rooms. And as well as, specifically the invoices of 2 and 3, exhibits 2 and 3, the invoices for repair

of that specific North laundry room dryer. There's certainly no question that exhibits 2 and 3 should be ordered as restitution paid by [defendant].

In addition, I do find that, based on the defendant's course of conduct as well as the other information presented at the trial in this matter, the information presented here today that it is appropriate to order the full $3710.90 again as a result of his force [sic] of conduct with all four of those laundry machines being, needing to be repaired. Again, that is based upon the trial testimony as a whole and so I will order the total amount requested and that is the amount of $4457.35 to be payable to Anthony Sergio.

In *Fawaz*, 299 Mich App at 64-65, this Court addressed restitution:

The [Crime Victim's Rights Act] CVRA governs restitution to crime victims. As a threshold matter, for purposes of restitution, the CVRA defines "victim" as "an individual who suffers direct or threatened physical, financial, or emotional harm as a result of the commission of a crime." MCL 780.766(1). The definition of "victim" "includes a sole proprietorship, partnership, corporation, association, governmental entity, or any other legal entity that suffers direct physical or financial harm as a result of a crime." *Id*. [. . . ]

Under the CVRA, restitution is mandatory, not discretionary:

[W]hen sentencing a defendant convicted of a crime, the court *shall* order, in addition to or in lieu of any other penalty authorized by law or in addition to any other penalty required by law, that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction or to the victim's estate. [MCL 780.766(2) (emphasis added).]

"[T]he prosecution bears the burden of establishing the proper amount" of restitution by a preponderance of the evidence. *People v Gahan*, 456 Mich 264, 276; 571 NW2d 503 (1997) MCL 780.767(4). "The amount of restitution to be paid by a defendant must be based on the actual loss suffered by the victim . . . ." *People v Bell*, 276 Mich App 342, 347; 741 NW2d 57 (2007). Moreover, when it enacted the CVRA, "the Legislature plainly intended to shift the burden of losses arising from criminal conduct—as much as practicable— from crime victims to the perpetrators of the crimes; thus, it is remedial in character and should be liberally construed to effectuate its intent." *People v Allen*, 295 Mich App 277, 282; 813 NW2d 806 (2011) (citation and quotation marks omitted).

In light of the standard of review and the purpose of the CVRA, to shift the burden of losses arising from criminal conduct from crime victims to the perpetrators, we cannot conclude that the trial court's award of restitution constituted an abuse of discretion. Although the October 12, 2022 incident involved the north laundry room dryer, Sergio indicated that there was also damage to the south laundry room machines, but there were no cameras to document the damage. Moreover, Sergio represented that he repeatedly had break-ins to his laundry rooms, but he could not afford a camera system. Eventually, the break-ins stopped for a time. But, when they resumed, Sergio

purchased the smoke detector cameras because the police were unable to assist him without proof. Sergio testified that he had mechanical abilities and worked to make the laundry machines functional. Indeed, at the preliminary examination, he testified that it cost him $1,200 in parts to make the dryer operational again. However, Sergio did not consult an official repair service provider until defendant was charged and arrested. And, under the CVRA, restitution is mandatory and the defendant must make full restitution arising from the defendant's course of conduct. *Fawaz*, 299 Mich App at 65, citing MCL 780.766(2). Under the circumstances, the trial court did not clearly err in finding that defendant should pay restitution to restore all four machines to account for the damage to the appliances' electronics and structure caused by defendant's theft of coins, particularly when Sergio did not request reimbursement for the loss in coins.

## V. DEPRIVATION OF FAIR TRIAL BY EVIDENTIARY ISSUES AND PROSECUTORIAL MISCONDUCT

In a Standard Four brief, filed under Administrative Order No. 2004-6, defendant's statement of issues I and II alleges that the district and trial courts deprived defendant of a "fair trial" during the preliminary examination.[10] Specifically, defendant challenges Sergio's testimony during the proceedings, contending that Sergio deleted the date and time from the videos and seemingly committed perjury, without correction by the prosecutor, by altering his testimony regarding the costs of fixing the dryer. We disagree.

"[T]o preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021) (quotation marks and citation omitted). When these steps are not taken, the issue is unpreserved and reviewed for plain error. *Id*.

This Court reviews the district court's bindover decision for an abuse of discretion. *Fairey*, 325 Mich App at 649. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

Defendant contends that he was deprived of fairness at the district court bindover because Sergio was permitted to testify that he inserted the smoke detector camera data into a computer. Defendant alleged that this action "may be why" the photo allegedly of defendant did not have a date or time stamp. At the preliminary examination, the less rigorous probable cause standard applied to bind a defendant over. *People v Plunkett*, 485 Mich 50, 57; 780 NW2d 280 (2010). The district court or magistrate may find probable cause but nonetheless have reservations regarding guilt, unlike a jury. *People v Anderson*, 501 Mich 175, 188; 912 NW2d 503 (2018). Thus, the district court appropriately considered this evidence. The video showed a possible connection between defendant and criminal acts and the weight of the evidence presented an issue

---

[10] To the extent that defendant's argument can be construed to challenge the evidence admitted at the preliminary examination, any error was harmless in light of the evidence presented at trial. See *People v Hall*, 435 Mich 599, 603-604; 460 NW2d 520 (1990).

for the jury's determination. *People v Trevino*, 155 Mich App 10, 15; 399 NW2d 424 (1986). Defendant's challenge to the admission of Sergio's video evidence because it lacks a date and time stamp is without merit.

Defendant also seemingly alleges that the prosecutor improperly presented perjured testimony when Sergio testified that he spent $1,200 fixing the dryer, but later requested nearly $4,400 for the repair. Defendant further contends that Sergio made additional contradictions when testifying about the extrapolation of data and about defendant's appearance on the premises. However, mere contradictions in a witness's testimony are insufficient to demonstrate that a prosecutor knowingly presented perjured testimony. *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998). And prosecutorial misconduct is not demonstrated when there is no attempt to prevent prior statements or contradictions from being disclosed. See *id*. This claim of error also does not entitle defendant to appellate relief.

## VI. SENTENCING CHALLENGES

Defendant contends that his Sixth and Fourteenth Amendment rights were violated as a result of inaccurate sentencing guidelines scoring and presentence investigation report (PSIR) information. In particular, defendant asserts that Prior Record Variables (PRVs) 1 and 5 as well as Offense Variables (OVs) 13 and 16 were improperly scored in an attempt to inflate his sentencing guidelines and ensure a prison sentence. We disagree.

Defendant objected to the sentencing court's assessment of points for PRVs 1 and 5 on different grounds below; consequently, his current challenges are unpreserved. And, although defense counsel initially appeared to agree that OV 16 was properly scored, he eventually challenged whether it was appropriately scored, preserving his current challenge for review. On the other hand, defendant did not object to the trial court's scoring of OV 13 below; therefore, his challenge is unpreserved.

This Court reviews de novo whether a trial court properly interpreted and applied sentencing guidelines. *People v McGraw*, 484 Mich 120, 123; 771 NW2d 655 (2009). This Court reviews for clear error the trial court's findings in support of points it assesses under the sentencing guidelines. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Clear error exists when an appellate court is left with a definite and firm conviction that the lower court made an error. *People v Buie*, 491 Mich 294, 315-316; 817 NW2d 33 (2012). The trial court's factual determinations "must be supported by a preponderance of the evidence." *Hardy*, 494 Mich at 438. A defendant is entitled to resentencing when an error in calculating sentencing guidelines occurred and alters the appropriate guidelines range. *People v Francisco*, 474 Mich 82, 89-90; 711 NW2d 44 (2006).

Moreover, "[a] defendant is entitled to be sentenced in accord with the law, and is entitled to be sentenced by a judge who is acting in conformity with [the] law." *Id*. at 90-91. Thus, "due process is satisfied as long as [a defendant's] sentence is based on accurate information and the defendant has a reasonable opportunity to challenge that information." *People v Miles*, 454 Mich 90, 100; 559 NW2d 299 (1997) (quotation marks and citation omitted).

"[T]his Court may review an unpreserved scoring issue for plain error affecting substantial rights." *Chelmicki*, 305 Mich App at 69 (quotation marks and citations omitted). To avoid forfeiture of the issue under the plain error rule, the defendant bears the burden to show that: (1) error occurred, (2) the error was plain, i.e., clear or obvious, (3) and the plain error affected substantial rights. *Id*. (quotation marks and citation omitted). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. (quotation marks and citations omitted).

Although the sentencing court did not err in scoring PRVs 1 and 5 and OV 16, it did plainly err in scoring points for OV 13. Even so, defendant is not entitled to relief because his guidelines range remained the same.

## A. PRV 1

Defendant contends that the sentencing court improperly assessed 75 points for PRV 1. We disagree.

PRV 1 is scored when a defendant has "prior high severity felony convictions." MCL 777.51(1). If a defendant has 3 or more prior high severity felony convictions, the sentencing court must assess 75 points for PRV 1. MCL 777.51(1)(a). But, if a defendant has only 2 prior high severity convictions, the sentencing court must assess 50 points for PRV 1. MCL 777.51(1)(b). Under MCL 771.51(2)(a), a conviction for a "crime listed in offense class Ms, A, B, C, or D" constitutes a " 'prior high severity felony conviction' . . ., if the conviction was entered before the sentencing offense was committed[.]"

The Sentencing Information Report (SIR) shows that the sentencing court ultimately assessed 50 points for PRV 1, not 75 points, as alleged by defendant. Moreover, defendant's trial counsel agreed that 50 points were properly assessed for PRV 1, arguably waiving this issue. See *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000). Regardless, defendant's PSIR reflects that he was convicted of armed robbery, MCL 750.529, in 1994, and breaking and entering a building with intent, MCL 750.110, in 2020.[11] Armed robbery is a Class A offense, MCL 777.16y, and breaking and entering a building with intent is a Class D offense, MCL 777.16f. Therefore, both offenses were prior high severity crimes, MCL 777.51(2)(a), and the sentencing court correctly assessed 50 points for PRV 1.

## B. PRV 5

Defendant also contends that the sentencing court improperly assessed 20 points for PRV 5. Again, we disagree.

The sentencing court must assess 20 points when a defendant has 7 or more prior misdemeanor convictions. MCL 777.55(1)(a). A misdemeanor conviction is only counted "if it is an offense against a person or property, a controlled substance offense, or a weapon offense."

---

[11] Defendant asserts that the breaking and entering was actually for an attempted breaking and entering, but a certified record of this conviction was admitted during trial.

MCL 777.55(2)(a). A prior misdemeanor conviction includes "a conviction for a misdemeanor under a law of this state, another state, a political subdivision of another state, or the United States if the conviction was entered before the sentencing offense was committed." MCL 777.55(3)(a).

The sentencing court assessed 20 points for 7 prior misdemeanor convictions. Defendant contends that the sentencing court erred by considering "[d]river's license violations" in assessing 20 points. The PSIR reflects that all driving while license suspended offenses were identified as "non-scorable misdemeanors." Instead, seven misdemeanor convictions were identified as "scorable": (1) use of cocaine in 2008, (2) possession of drug paraphernalia in 2009, (3) resisting law enforcement in 2010, (4) possession of drug paraphernalia in 2011, (5) deceptive practices – intent to defraud by threat or deception in 2013, (6) possession of drug paraphernalia in 2013, and (7) attempted theft in 2013. Thus, the sentencing court properly assessed 20 points for PRV 5.

## C. OV 13

Defendant asserts that the sentencing court improperly assessed 10 points for OV 13. Although we agree, this issue does not entitle defendant to resentencing.

OV 13 addresses whether the instant offense is part of a continuing pattern of criminal behavior. MCL 777.43(1). A sentencing court must score 10 points for OV 13 when the sentencing "offense was part of a pattern of felonious criminal activity involving a combination of 3 or more crimes against a person or property or a violation of [MCL 333.7401(2)(a)(*i*) to (*iii*) or MCL 333.7403(2)(a)(*i*) to (*iii*)]." MCL 777.43(1)(d). But when the sentencing offense is "part of a pattern of felonious criminal activity involving 3 or more crimes against property," a sentencing court may only assess 5 points for OV 13. To determine the appropriate points to be assessed under OV 13, "all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." MCL 777.43(2)(a).

The instant offense occurred on or about October 12, 2022. Within the 5-year period, defendant committed: (1) larceny in a building, MCL 750.360, in 2019, (2) breaking and entering a building with intent twice in 2020, and (3) breaking and entering a coin-operated device, MCL 752.811, three times in 2020. Larceny in a building, breaking and entering a building with intent, and breaking and entering a coin-operated device are all crimes against property. MCL 777.16f; MCL 777.16r; MCL 777.17.

Although defendant has shown plain error because the sentencing court should have assessed 5 points for OV 13 rather than 10 points, he is not entitled to relief. Even with this reduction, defendant's total OV score is 10 points, meaning he remains in OV Level II. See MCL 777.66. Because defendant's sentencing guidelines range did not change, defendant is not entitled to resentencing. *Francisco*, 474 Mich at 89, n 8 ("Where a scoring error does not alter the appropriate guidelines range, resentencing is not required.").

## D. OV 16

Defendant argues that because the victim's testimony regarding restitution was unreliable, the sentencing court improperly assessed 5 points for OV 16. We disagree.

OV 16 addresses the value of "property obtained, damaged, lost, or destroyed." MCL 777.46(1). The sentencing court must assess 5 points when "[t]he property had a value of $1,000.00 or more but not more than $20,000.00." MCL 777.46(1)(e).

Given the proofs presented by Sergio, the victim, we discern no error in the sentencing court's assessment.

### E. DEFENDANT'S SENTENCING GUIDELINES RANGE

Defendant also contends his sentencing range was unlawfully increased for the sole purpose of imposing prison time over county jail time. We disagree because the sentencing court's sentence was within the recommended guidelines range.

Defendant further asserts that the sentencing court's failure to sign the SIR is error. This issue is not preserved because it was not raised in the defendant's statement of question presented. MCR 7.212(C)(5). Regardless, the sentencing court evaluated defendant's scoring objections and correctly scored the guidelines. This failure does not require remand.

Finally, defendant complains that his trial counsel and appellate counsel performed deficiently in failing to raise his scoring challenges. Again, this issue is not separately raised. MCR 7.212(C)(5). Regardless, the record reveals that trial counsel did challenge the guidelines at sentencing. Moreover, appellate counsel explained in a letter to defendant why his PRV challenges failed. Consequently, defendant has not established either attorney performed deficiently or that he was prejudiced. *People v Ericksen*, 288 Mich App 192, 205; 793 NW2d 120 (2010) ("[F]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

### VII. REINSTATEMENT OF PLEA OFFER

Next, defendant alleged that he had a plea agreement that was not honored. We disagree.

The trial court's determination that there was a breach of a plea agreement is reviewed for clear error. See *People v Abrams*, 204 Mich App 667, 673; 516 NW2d 80 (1994). Unpreserved errors are reviewed for plain error affecting substantial rights. *Chelmicki*, 305 Mich App at 62, citing *Carines*, 460 Mich at 763-764.

Defendant failed to demonstrate the factual predicate for his claim of error, namely that there was a plea agreement. Because there was no indication that he ever received and accepted a plea offer, defendant cannot demonstrate plain error affecting his substantial rights. Accordingly, this claim of error does not entitle him to appellate relief. *Id.*

### VIII. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant contends that trial counsel was ineffective for various reasons. We disagree.

To preserve a challenge to the effective assistance of counsel, a defendant must move for a new trial or for a hearing under *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

*People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Because defendant failed to pursue these actions, his challenge is unpreserved. When a *Ginther* hearing is not held, appellate review is limited to mistakes apparent on the record. *Abcumby-Blair*, 335 Mich App at 227.

The Michigan and United States Constitutions guarantee criminal defendants the right to be represented by an attorney. Const 1963, art 1, § 20; US Const, Am VI. A criminal defendant is entitled to the effective assistance of counsel. *People v Otto*, 348 Mich App 221, 231; 18 NW3d 336 (2023). "A defendant must meet two requirements to warrant a new trial because of the ineffective assistance of counsel." *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011). The defendant must first demonstrate "that counsel's performance fell below an objective standard of reasonableness. In doing so, the defendant must overcome the strong presumption that counsel's assistance constituted sound trial strategy." *Id*. at 290. In examining defense counsel's performance, "the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Second, the defendant must show that, "but for counsel's deficient performance, a different result would have been reasonably probable." *Armstrong*, 490 Mich at 290. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

The defendant bears the burden of demonstrating the factual predicate for his claim of ineffective assistance of counsel. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). When claiming ineffective assistance premised on defense counsel's unpreparedness, there is a requirement that a defendant show prejudice resulting from this alleged lack of preparation. *People v Caballero*, 184 Mich App 636, 640; 459 NW2d 80 (1990). This showing can be made through evidence of an investigation or affidavits that would reveal information beneficial to the defendant. *Id*. "The failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004). To succeed on a claim of ineffective assistance premised on the failure to call witnesses, a defendant need not demonstrate a deprivation of a substantial defense. *People v Jurewicz*, 506 Mich 914, 915; 948 NW2d 448 (2020). Rather, the standard applicable to ineffective assistance for the failure to call witnesses is the same for all other such ineffective assistance of counsel claims; it involves consideration of whether counsel's performance fell below an objective standard of reasonableness and, but for counsel's deficient performance, whether there is a reasonable probability that the outcome would have been different. *Id*.[12]

Defendant contends that his trial counsel failed to give notice of and notify his alibi witnesses, his wife Melissa and his brother-in-law West. But, on the second day of trial, defense counsel alerted the trial court that he had notified defendant's family members that they needed to

---

[12] Although the *Jurewicz* decision was rendered in an order, not an opinion, "Supreme Court orders that include a decision with an understandable rationale establish binding precedent." *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

be present at court at 10:00 a.m. At 10:18 a.m., the family members still had not arrived. Defense counsel attempted to call the family again. As of 10:30 a.m., the family had not appeared. And one family member had attended the first day of trial. At that time, defense counsel advised the family member of the time to appear in court on the second day. Moreover, defense counsel did file a notice of intent to raise a lack of presence (alibi) defense. On April 6, 2023, defendant filed an amended notice of alibi indicating that Melissa Lipscomb, Jasmine Lipscomb, and Duane West would testify that defendant was either at home or at work at the time of the alleged offense on October 12, 2022. And Melissa Lipscomb was listed as an alibi witness on the notice filed on March 13, 2023. Defendant's family members were also listed on his witness list. There is no record evidence reflecting why defendant's alibi witnesses did not appear. In light of the documentary evidence and the transcripts, it is not apparent that the alibi witnesses' failure to appear was the product of ineffective assistance of counsel.

Defendant raises the following additional claims of ineffective assistance: trial counsel failed to prepare by interviewing and calling Sergio's tenants; failed to secure video evidence reflecting a date and time; failed to timely challenge bad acts evidence; and failing to meet with defendant and prepare a defense. Additionally, defense counsel failed to pursue the prosecutor's plea offer of "10 months," and failed to prepare to challenge defendant's prior convictions and scoring variables causing three sentencing hearings to occur.

Again, defendant bears the burden of establishing the factual predicate for his claim and demonstrating a mistake apparent on the record. Although defendant alleges that Sergio's tenants should have been called to testify, there is no indication what relevant testimony they would have offered. It is unclear how defendant would have obtained a time stamp or dated copy of Sergio's surveillance video because he testified that the camera model did not have that feature. Defense counsel did timely challenge the other-acts evidence and a hearing was held. Moreover, there is no indication that defense counsel caused three sentencing hearings to occur. Rather, defendant had out-of-state criminal convictions that required further review. And, although defendant contends that counsel should have pursued a plea offer of "10 months," no such agreement was located in the lower court record. Finally, defendant fails to proffer what defense should have been pursued by his counsel. It appeared that defendant chose to claim that he committed a criminal act in Parkview in 2020, not 2022, and his earlier guilty plea agreement precluded this charged offense. Defense counsel pursued this theory. While defendant raises a litany of errors, he failed to submit an affidavit or other evidence to support his claims of ineffective assistance and the record does not support his assertions. Accordingly, defendant has not met his dual burden of establishing that he is entitled to relief on these claims.

Affirmed.

/s/ Anica Letica
/s/ Michael J. Kelly
/s/ Philip P. Mariani